IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:24-CV-470-RJ

MICHAEL JENKINS,

   Plaintiff/Claimant,

v.

FRANK BISIGNANO,
*Commissioner of Social Security*,

   Defendant.

ORDER

   This matter is before the court on the parties' briefs filed pursuant to the Supplemental Rules for Social Security Actions. [DE-14, -16]. Claimant Michael Jenkins ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the denial of his application for Supplemental Security Income ("SSI") payments. Briefing is complete, and the matter is ripe for adjudication. Having carefully reviewed the administrative record and the briefs submitted by the parties, the decision of the Commissioner is reversed and the matter is remanded for further proceedings.

## I. STATEMENT OF THE CASE

   Claimant protectively filed an application for SSI payments on May 23, 2022, alleging disability beginning that same date. (R. 14, 174–82). The claim was denied initially and upon reconsideration. (R. 58–77). A telephone hearing before an Administrative Law Judge ("ALJ") was held on August 14, 2023, at which Claimant, represented by counsel, and a vocational expert ("VE") appeared and testified. (R. 30–57). On November 28, 2023, the ALJ issued a decision denying Claimant's request for benefits. (R. 11–29). On June 12, 2024, the Appeals Council

denied Claimant's request for review. (R. 1–6). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set

forth in 20 C.F.R. § 416.920, under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 416.920a(b)–(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* § 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 416.920(e)(4).

## IV. ALJ'S FINDINGS

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant had not engaged in substantial gainful activity since the application date. (R. 16). Next, the ALJ determined Claimant had the severe impairments of diabetes mellitus, hip arthritis, achilles tendonitis, cellulitis, degenerative disc disease, and leg ulcer, and the non-severe impairments of essential

3

hypertension, depression, and substance addiction. (R. 16–17). Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in no limitations in understanding, remembering, or applying information and in interacting with others and mild limitations in concentrating, persisting, or maintaining pace and in adapting or managing oneself. (R. 17). At step three, the ALJ concluded Claimant's impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17–18). Prior to proceeding to step four, the ALJ assessed Claimant's residual functional capacity ("RFC"), finding that he had the ability to perform light work[1] with the following restrictions:

> occasionally climbing ramps and stairs; never climb ladders, ropes, or scaffolds; frequently stoop, kneel, crouch, and crawl; and have no exposure to unprotected heights.

(R. 18–23). In making this assessment, the ALJ found Claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms to be not entirely consistent with the medical evidence and other evidence in the record (R. 19). At step four, the ALJ concluded Claimant has no past relevant work. (R. 23). At step five, upon considering Claimant's age, education, work experience, and RFC, the ALJ determined there are jobs that exist in significant numbers in the national economy that he can perform. (R. 23–24).

## V. DISCUSSION

Claimant contends that the ALJ erred in formulating the RFC by failing to account for (1) Claimant's medical necessity for use of an assistive device, and (2) Claimant's alleged

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. § 416.967(b).

4

limitations due to chronic hidradenitis. Pl.'s Br. [DE-14] at 12–20. The Commissioner counters that substantial evidence supports the ALJ's determination that Claimant had the RFC to perform light work without an assistive device and was not more limited by hidradenitis than accounted for in the RFC. Def.'s Br. [DE-16] at 6–12.

An individual's RFC is the capacity an individual possesses despite the limitations caused by physical or mental impairments. 20 C.F.R. § 416.945(a)(1). "[T]he residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting S.S.R. 96-8p). The ALJ must provide "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* (quoting SSR 96-8p); *see also Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (observing that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion"). However, the Fourth Circuit has rejected "a per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis." *Mascio*, 780 F.3d at 636. Rather, the court explained that "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* (citation omitted).

Claimant testified at the administrative hearing that he experiences pain in his right foot/ankle that prevents him from walking or standing for more than approximately twenty minutes before needing to sit, he used crutches when walking until they were stolen, and he

5

walks behind a wheelchair using it like a walker.[2] (R. 43–44). Claimant wobbles and staggers without the use of an assistive device but has not fallen. (R. 45). The VE testified that an individual requiring a position change, i.e., a sit-stand option, every twenty minutes or the use of an assistive device, i.e., crutches or a wheelchair used as a walker, could not perform work at the light exertion level. (R. 56).

"The requirement to use a hand-held assistive device may . . . impact . . . [an] individual's functional capacity by virtue of the fact that one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling." *Daniel v. Berryhill*, No. 5:17-CV-338, 2018 WL 4134844, at *5 (E.D.N.C. July 13, 2018), *adopted by*, 2018 WL 4113340 (E.D.N.C. Aug. 29, 2018). Although Social Security Ruling ("SSR") 96-9p addresses the use of a handheld assistive device by individuals capable of less than a full range of sedentary work, "district courts within the Fourth Circuit have consistently referred to [SSR 96-9p] for direction when a claimant alleges that the ALJ failed to properly consider the claimant's use of a hand-held assistive device in the RFC analysis." *Id.* (citing *Lovejoy v. Berryhill*, No. 2:17-CV-02921, 2018 WL 2729240, at *14 (S.D.W. Va. May 2, 2018), *adopted by*, 2018 WL 2728032 (June 5, 2018)).

SSR 96-9p provides that an "RFC assessment must include a narrative that shows the presence and degree of any specific limitations and restrictions, as well as an explanation of how the evidence in file was considered in the assessment." S.S.R. 96-9p, 1996 WL 374185, at *5

---

[2] Claimant testified by telephone at the administrative hearing, and there are several instances where the ALJ and Claimant's attorney had difficulty hearing or understanding his testimony. *See generally* [DE-8]. For example, the transcript indicates Claimant stated he could walk "[p]robably three minutes" before needing to sit, but when the ALJ asked Claimant's attorney if she heard the response, the attorney stated, "I thought he said about 20 minutes and then he has to sit down," and Claimant affirmed that is what he said. (R. 43–44, 46). Another exchange involved Claimant's work cleaning shoes at the Durham Rescue Mission as a requirement of living there and why he stopped working and had to leave the Mission, and none of the testimony on these issues was clear leaving potentially material questions unanswered. (R. 50–52); *see also* (R. 534) (treatment note indicating Claimant can be hard to understand and difficult to communicate with). On remand, the ALJ should consider whether a telephone hearing in this case is appropriate.

(July 2, 1996). An ALJ must consider the impact of a "medically required hand-held assistive device." *Id.* at *7. For an ALJ to find that a handheld assistive device is medically required, "there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." S.S.R. 96-9p, 1996 WL 374185, at *7 (July 2, 1996). A claimant's subjective testimony that they require the use of a walker does not constitute "medical documentation" establishing such need under SSR 96-9p. *See Scottie J. D. v. O'Malley*, No. 1:23-CV-695, 2024 WL 2746799, at *6 (M.D.N.C. May 29, 2024) (citing *Hale v. Kijakazi*, No. 1:20-CV-277, 2021 WL 3625319, at *2 (W.D.N.C. Aug. 16, 2021) (holding that "[s]ubjective claims . . . are insufficient" to establish medical documentation of cane necessity required by SSR 96-9p), *adopted sub nom. Scottie v. O'Malley*, 2024 WL 3498405 (M.D.N.C. July 22, 2024)); *Thomas H. v. Berryhill*, No. 4:17-CV-41, 2018 WL 10806837, at *8 (W.D. Va. Aug. 27, 2018) ("The mere fact that [the plaintiff] sometimes presented to clinic appointments with a cane [ ] does not establish his underlying medical need to use that device.").

The ALJ found that Claimant could perform light work, (R. 18), which requires up to six hours of standing or walking in an eight-hour workday, S.S.R. 83-10, 1983 WL 31251, at *6 (1983). The ALJ recounted Claimant's testimony regarding his standing and walking limitations and use of an assistive device, (R. 19), but did not account for them in the RFC, and provided the following explanation:

> As to the claimant's use of an assistive device including crutches, the record does not support the medical necessity for any assistive device which the claimant reportedly used for his ankle and hip pain. Although the consultative examiner opined that he needed an assistive device for short and long distances and uneven terrain, no treating provider has recommended or advised the use of an assistive

7

> device. As to his hip arthritis, imaging showed only mild degenerative changes, for which the claimant has received minimal treatment. Likewise, with regard to his right Achilles pain, a right ankle x-ray was unremarkable, and he has received routine treatment of a minimal nature, with noted improvement. There is no evidence of any follow up with an orthopedist as recommended. Moreover, physical exams have been mostly unremarkable, showing he was able to move all extremities and had no focal neurological deficits (Ex. B4F, 6F).

(R. 22). Similarly, in evaluating the referenced consultative examiner's opinion, the ALJ stated as follows:

> The undersigned considered the opinion of the consultative examiner and finds it unpersuasive. The opinion that the claimant needs an assistive device for short and long distances and uneven terrain is unpersuasive as it is based on a one-time evaluation, and no treating provider has recommended or advised the use of an assistive device. Moreover, hip imaging showed only mild degenerative changes, and a right ankle x-ray was unremarkable. Moreover, the claimant has received minimal treatment for these conditions, and physical exams have been mostly unremarkable, showing he was able to move all extremities and had no focal neurological deficits (Ex. B4F, 6F). Additionally, the opinions regarding exertional limitations and postural limitations are not persuasive as they are not expressed in vocationally relevant terms.

*Id.*

Claimant argues that the ALJ's reasoning is flawed because the consultative examiner was not the only medical provider who determined Claimant required an assistive device for standing and walking; the ALJ downplayed Claimant's hip degenerative joint disease and arthritis, ankle fracture, and radiological findings to conclude Claimant's impairments were not severe enough to justify the use of an assistive device; the ALJ failed to evaluate how Claimant's poverty and homelessness affected his ability to obtain specialty care; and the ALJ emphasized irrelevant negative examination findings. Pl.'s Br. [DE-14] at 14–19. The court agrees that the ALJ's reasoning is flawed, because it fails to build the requisite "accurate and logical bridge" from the evidence to the conclusion that Claimant did not require the use of an assistive device.

The ALJ's decision mentions Claimant's testimony that he had no insurance and could

8

not afford his medications, as well as treatment notes indicating he was unable to make an appointment due to transportation issues, he was not taking his medications, and he had generally not attempted outpatient follow-up after emergency department visits. (R. 19–22). In finding that Claimant did not require an assistive device, the ALJ noted the minimal treatment he received for his hip and ankle impairments, lack of follow up with an orthopedic specialist, and improvement. (R. 22). Yet, as evidenced by the discussion below, a thorough review of the testimony and medical records indicates that Claimant's homelessness impacted his ability to receive primary care or specialty treatment, to comply with recommended treatment, and to access routine medical care and medications outside the emergency department setting and that his pain and difficulty ambulating were persistent rather than improved.

A June 20, 2022 emergency department note reflects that Claimant was unable to ambulate, but that x-rays were negative for any "significant acute osseous abnormality"; he was diagnosed with right achilles bursitis and instructed to implement the RICE protocol; and he was prescribed a seven-day course of Naprosyn and advised to use crutches for three days, advance weight bearing as tolerated, and follow-up with his primary care provider. (R. 503). Two days later, Claimant had a follow-up visit with his primary care provider in Rocky Mount, North Carolina, and the treatment note indicated that Claimant had been living in a transitional home, and a representative from the home was present and reported Claimant's symptoms had been present for three to four weeks prior to his hospital visit and he had been unable to perform ADLs due to the pain in his right heel. (R. 469). On examination, Claimant demonstrated tenderness with palpation of the right achilles tendon and left lateral portion of the ankle, and it was noted that he ambulated with crutches, his symptoms were unchanged since the hospital visit, and he was still in pain but had not filled the Naprosyn prescription. (R. 469, 471).

9

Claimant was assessed with "persistent pain of the right achilles tendon that has been ongoing for greater than one month and not improving with conservative treatment" and was referred to orthopedics with a notation that he would "need charity care." (R. 471, 904). Claimant returned to the hospital on June 27, with the same complaints of heel pain but had still not filled his Naprosyn prescription, he stated he was having difficulty with ambulation, and he was given one dose of Solumedrol and a prednisone taper. (R. 497). On July 7, Claimant presented at the emergency department again with heel pain, and he was ambulating with crutches but had attempted nothing for relief and had not seen a provider in follow-up since his last visit. (R. 760–61). Claimant was advised regarding supportive care and encouraged to pursue outpatient follow-up. (R. 761).

On July 28, 2022, a Patient Outreach Care Coordinator from the emergency department spoke to Claimant to offer services via Health Assist given his two emergency department visits within 30 days, and Claimant reported having an upcoming primary care visit on August 22, and not needing additional help at that time. (R. 492–94). However, the following day Claimant went to the emergency department with suicidal ideations, (R. 685), was noted to be ambulating with crutches, (R. 686), and was admitted to an inpatient psychiatric unit on July 30, where Claimant was noted for "Fall Injury Risk" and "assistive device" as a safety intervention, (R. 698, 701). Claimant reported that he had been living on a friend's front porch. (R. 695). On August 1, Claimant was seen using a "wheelchair to get around," and his fall risk was unchanged. (R. 711–12). Claimant also discussed his desire to be admitted to the Durham Rescue Mission and when informed of its requirement that residents perform 40 hours of work weekly, Claimant indicated he could meet that demand. (R. 727). When asked about his wheelchair use, Claimant stated that "he has a problem with his feet and is staying off of them

10

right now." *Id.* On August 2, Claimant continued to use a wheelchair due to "unsteady gait," and when asked again about the work requirement at the Rescue Mission, Claimant stated he did not need the wheelchair but would need his crutches due to his chronic knee and heel pain. (R. 738, 740). On August 4, Claimant was discharged to a homeless shelter in Rocky Mount, North Carolina. (R. 751). However, later that same day Claimant presented again to the emergency department after he was not admitted to the homeless shelter. (R. 539). Claimant indicated the shelter offered him a top bunk, but he was unable to get on a top bunk due to his injured ankle, so he left the shelter. *Id.* Claimant was admitted again for inpatient treatment on August 5, after presenting with suicidal ideation due to his inability to secure housing, and it was noted he was using crutches due to right ankle pain. (R. 542–43). On August 15 and 16, it was noted that Claimant was ambulating with a walker. (R. 658, 666). Claimant was discharged on August 16 to the Durham Rescue Mission. (R. 682).

An October 26, 2022 treatment note from Samaritan Health Center in Durham, North Carolina indicated that Claimant had resided at the Durham Rescue Mission since August, and he presented to establish care. (R. 525). Claimant was accompanied by a peer support specialist who provided transportation and care coordination for his medical visits. (R. 525, 534). Claimant reported hip pain of 8 to 9 out of 10, he ambulated with crutches, and he had been unable to fill his Naprosyn prescription but had received some unspecified medications earlier that day, and Claimant was provided with pillboxes that were filled during the appointment. (R. 19, 525–26). A treatment note from a November 28 follow-up visit conducted by telephone indicated that Claimant had left the Durham Rescue Mission and moved back to Rocky Mount, he had not taken medications for a few days since leaving the Mission, he was encouraged to establish care with a clinician in Rocky Mount and to follow-up on his medications, and he was

11

aware he could contact NC Med Assist for prescriptions. (R. 932). Claimant also testified at the administrative hearing that he was homeless and living on a porch, and he had not taken his medications since they were stolen two months prior. (R. 40–42).

In sum, the record is replete with references to Claimant's persistent foot pain, difficulty ambulating, and use of an assistive device due to achilles bursitis. While Claimant was initially prescribed crutches to use for only three days, he remained symptomatic at the follow-up visit with primary care and was referred to orthopedics. Although Claimant did not see an orthopedist, he continued to visit the emergency department with complaints of foot pain and difficulty walking and shortly thereafter was twice admitted for in-patient mental-health related treatment, during which time he utilized an assistive device. The ALJ noted the failure to consult an orthopedist but did not consider the reason he failed to pursue this treatment. The ALJ must "consider and address reasons for not pursuing treatment that are pertinent to an individual's case," including whether a claimant is unable to afford treatment and lacks access to free or low-cost medical services. S.S.R. 16-3p, 2016 WL 1119029, at *10 (Mar. 16, 2016); *see Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984) ("It flies in the face of patent purposes of the SSA to deny benefits to someone because he is too poor to obtain medical treatment that may help him."). The court rejects the Commissioner's position that the ALJ did not base conclusions on a failure to follow recommended treatment, Def.'s Br. [DE-16] at 9 n.2, where the ALJ noted multiple times in the RFC analysis that Claimant was not taking his medications and had not attempted outpatient follow-up after emergency department visits or follow-up with an orthopedist as recommended. (R. 19–22). The ALJ was required to consider and address Claimant's homelessness and lack of insurance as reasons for not pursuing further treatment and not taking his medications, *see Higgs v. Berryhill*, No. 4:18-CV-22-FL, 2019 WL 848730, at *5

(E.D.N.C. Jan. 10, 2019) (finding claimant's homelessness was a potential reason for her failure to seek treatment, so the ALJ should have considered it in his discussion of why her testimony was not fully consistent with the medical and other evidence) (citing S.S.R. 16-3p, 2016 WL 1119029, at *9), *adopted by*, No. 4:18-CV-22-FL, 2019 WL 845406 (E.D.N.C. Feb. 21, 2019), and the failure to do so in this case requires remand where it is not the court's role to consider this issue in the first instance.

The court also agrees with Claimant that the ALJ minimized Claimant's hip degenerative joint disease and arthritis, ankle fracture, and radiological findings and improperly emphasized negative examination findings to conclude that Claimant's impairments were not severe enough to justify the use of an assistive device. First, the ALJ stated that a right ankle x-ray was unremarkable, which is accurate regarding a June 20, 2022 x-ray, (R. 507), but a July 7, 2022 x-ray revealed a potential stress fracture, (R. 864), material objective evidence which the ALJ failed to note. (R. 22). Second, while the ALJ pointed to imaging of Claimant's hip indicating only mild degenerative changes, (R. 22, 1032), there was also a hip x-ray in the record that Claimant's doctor characterized as showing "bad arthritis," (R. 464), and a 2023 pelvic CT indicating "SI joint mild to moderate degenerative change with partial ankylosis." (R. 1032). Third, the ALJ improperly emphasized Claimant's ability to move his extremities and lack of focal neurological deficits as evidence Claimant did not require an assistive device while ignoring relevant findings such as tenderness to palpation of the plantar fascia, achilles tendon, and left lateral portion of the ankle, swelling, slow antalgic gait, inability to walk on heels and toes with ease, abnormal tandem walking, inability to stand and hop on one foot bilaterally despite good effort, and hip tenderness over ASIS. (R. 471, 497, 501, 534, 983–84, 1041). While the ALJ noted some of these findings in summarizing the evidence, they were minimized

13

or altogether omitted when evaluating Claimant's need for an assistive device. The ALJ is not permitted to "play doctor" by reinterpreting imaging results or medical findings, *Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017), and the Fourth Circuit has repeatedly held that "while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020) (quoting *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989)). Finally, the ALJ applied the same faulty reasoning, and relied on Claimant's lack of treatment without exploring the reasons therefor, when rejecting the consultative examiner's opinion that Claimant required an assistive device, (R. 22, 985), and as such, the ALJ's assessment that the opinion was unpersuasive is not supported by substantial evidence and requires reconsideration. *See Pepper v. Comm'r of Soc. Sec. Admin.*, No. 22-1381, 2023 WL 3073532, at *2 (4th Cir. Apr. 25, 2023) (applying substantial evidence review to the ALJ's assessment of opinion evidence under 20 C.F.R. § 416.920c). Accordingly, the court cannot trace the ALJ's reasoning in concluding the record did not support the medical necessity for use of an assistive device, and the matter must be remanded for further proceedings where the VE testified that light work would be unavailable to an individual requiring the use of an assistive device, (R. 56).

Given that this issue alone requires remand, the court does not reach the issue of Claimant's cellulitis and leg wounds, other than to note that the ALJ's discussion of the evidence appears to acknowledge that these were recurring problems, (R. 20), yet in a conclusory fashion the ALJ found that "any limitations therefrom do not preclude the performance of work within the significant limitations set forth above." (R. 21–22); *see* (R. 1019–21) (April 10, 2023 emergency department treatment note for chronic right gluteal wounds with recent increase in

14

drainage and discomfort and noted uncontrolled diabetes, difficulty affording medications, and lack of transportation affecting care). The ALJ should provide the requisite "logical explanation" regarding these impairments and how they impact Claimant's functioning on remand. *See Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) ("[A] proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion . . . . [M]eaningful review is frustrated when an ALJ goes straight from listing evidence to stating a conclusion."); *Mascio*, 780 F.3d at 636 ("Remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record").

## VI. CONCLUSION

For the reasons stated above, the final decision of the Commissioner is reversed and the matter is remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

So ordered, this the 4th day of August, 2025.

Robert B. Jones, Jr.
United States Magistrate Judge